STATE CORPORATION COMMISSION OF KANSAS, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. T-854.

United States District Court, D. Kansas.

July 29, 1954.

Byron M. Gray, Topeka, Kan., for plaintiffs.

Leo H. Pou, Asst. Chief Counsel, Interstate Commerce Commission; Washington, D. C., Willard R. Memler, Sp. Asst. to the Atty. Gen., and William C. Farmer, U. S. Atty., Wichita, Kan., for defendants.

S. R. Brittingham, Jr., Chicago, Ill., and W. E. Treadway, Topeka, Kan., for intervenor railroads.

Louis A. Schwartz, New Orleans, La., for New Orleans Traffic Transportation Bureau, intervenor.

Before HUXMAN, Circuit Judge, MELLOTT, Chief Judge, and HILL, District Judge.

HUXMAN, Circuit Judge.

This action brought under Acts of Congress, approved June 25, 1948 and May 24, 1949, 28 U.S.C. § 1336 et seq., charging violations of Sections 1 and 3(1) of the Interstate Commerce Act, 49 U.S.C.A. §§ 1, 3(1), is another chapter in the long drawn out proceedings and challenges to the orders of the Interstate Commerce Commission, having their genesis in the Hoch-Smith Resolution passed by Congress in 1925, 49 U.S. C.A. § 55. That resolution directed the Commission to make a comprehensive investigation of the rate structure of common carriers in order to adjust such rate structure with a view to eliminating inequities or undue preferences therein and to establish such rates as might be found necessary to correct inequities in the existing general rate structure. Pursuant to the Congressional mandate, the Commission undertook comprehensive investigations of all phases of the rate structure. The history of such proceedings is recited in detail in the opinion of the Supreme Court of the United States in Board of Trade of Kansas City, Mo. v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432, and will not be repeated in detail herein.

In approaching its problems, the Commission divided the United States into different segments. We are concerned here with the territory designated as the Western District and the territory designated as the Southern Territory. Kansas and Oklahoma are included in the Western District and the Carolinas are included in the Southern Territory. Involved in this litigation are grain rates from Kansas and Oklahoma into the Southern Territory via the gateway of Memphis, Tennessee. The Commission divided its labors into two parts,

the first, so far as this case is concerned, dealing with grain rates from the Western District to the gateway of Memphis, and the other with grain rates from Memphis into the Southern Territory. In fixing grain rates for Oklahoma and Kansas, the Commission divided the states into groups of contiguous territory and fixed rates for each group. In Oklahoma it considered the territory in and around Enid as representative of Oklahoma and in Kansas it treated the territory placed in the Wichita group as representative of Kansas. The Commission fixed rates for these two representative territories and correlated the rates of the other groups in each state to the rates established for the representative group in each state. The Commission's studies regarding the Western Territory and the Southern Territory were carried on at different times. It first completed its work in the Western Territory and promulgated its rate orders therein in what has become known as the Grain Case. This part of the Commission's order established grain rates in the Western Territory effective July 1, 1935. It established rates for the various groups in Oklahoma and Kansas, two adjoining and competing grain producing and flour milling states, to Memphis, Tennessee.

For the purpose of this litigation, it is necessary to consider only the rates fixed for the two representative groups, Enid and Wichita, because, as stated, the rates of the other districts are related to them. If these rates are lawful, the rates of the various other districts likewise must stand. If they fall, a reconsideration of the remaining rates would be required.

In the Grain Case, so far as we are concerned, the Commission fixed a rate effective July 1, 1935, of 34 cents from Enid to Memphis, and a like rate for Wichita to the same point. Petitions for modification of various parts of the order were filed by dissatisfied groups. Apparently the proceedings were not reopened and no further hearings were held, but on March 24, 1936, a supplemental report was filed by the Commission reducing the Enid rate to Memphis to 32 cents, effective August 1, 1936. but leaving the Wichita rate at 34 cents. When the Commission reduced the Enid rate to 32 cents, it made readjustments in the rates of other Oklahoma groups by relating them to the new Enid rate.

The Commission's studies concerning the rates into Southern Territory were not completed until 1946. That case involved a consideration of the grain rates from all the grain producing areas into Southern Territory, including the rates to the gateways of Southern Territory as well as rates beyond the gateways. Memphis is one of the gateways into that territory from Kansas and is the gateway to such territory from Oklahoma. While changes were made in the rates from the Enid and the Wichita groups, as well as other groups in the two respective states, to Memphis from time to time, the difference of 2 cents in favor of Enid over Wichita was continued. In the Southern Grain Case the Wichita group was divided into a Southern and a Northern Division and higher rates to Memphis were fixed from the Northern portion than from the Southern portion thereof.

After the decision in the Southern Case, the Kansas Corporation Commission instituted this proceeding before the Commission, challenging the rate order in the Grain Case and in the Southern Case. Hearings were held by the Commission, resulting in the rate order challenged herein. The Commission recombined the Northern and Southern Divisions of the Wichita group and treated the combined territory as one group, as in the Grain Case. The difference of 2 cents in the grain rates between the Wichita and Enid groups was increased to 3.5 cents in favor of Enid. Kansas was opposed in this hearing by Oklahoma and Texas, intervenors. In opposition to Kansas' position, they contended (a) that weighted average mileage comparison of distances from Wichita and Enid to Memphis was not a proper factor for consideration by the

Commission, (b) that reliance upon relative distances of whatever kind in view of the difference in the character of rate adjustments from Kansas and Oklahoma to Memphis was improper and (c) that the adjustment complained of having been prescribed as a reasonable part of the Southern adjustment could not now be changed without a showing of changed conditions. The Commission held against the intervenors on all those contentions and adhered to its views that weighted average was a proper measure for comparing relative distances from Enid and Wichita to a common gateway, Memphis. It adhered to its findings in the Southern Case wherein it found that "The distances to Memphis from Southern and Central Kansas closely approximate those from Oklahoma, and traffic and transportation conditions are very similar from all of these highly competitive areas." Notwithstanding this finding not repudiated by the Commission, the Commission nonetheless, as pointed out, increased the difference in the two rates from 2 cents to 3½ cents in favor of Enid.

We may not, however, set aside the order of the Commission merely because we might conclude that the Commission erred in its conclusions or because it is difficult for us to understand how a difference of 3.5 cents in the grain rate of two adjoining territories, engaged in the same business, highly competitive with each other, both being the same distance from a common destination, and transportation conditions from them to the common point being the same, could be justified.

■ All the authorities make it clear that the scope of review by a court of proceedings and orders of the Commission under the Interstate Commerce Commission Act is a limited one. A good statement of the law is found in the early case of Interstate Commerce Commission v. Union Pacific Railroad Co., 222 U.S. 541, 32 S.Ct. 108, 110, 56 L.Ed. 308, where the court said: "There has been no attempt to make an exhaustive statement of the principle involved, but in cases thus far decided, it has been settled that the orders of the Commission are final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law. But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if it appears that (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power. * * *

■ "In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the Commission are made by law *prima facie* true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' * * * Its conclusion, of course, is subject to review, but, when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order." In United States v. Louisville & Nashville Railroad Co., 235 U.S. 314, 35 S.Ct. 113, 59 L.Ed. 245, the court held that a reviewing court may not substitute its judgment for that of the Commission, even though

**650**

there be no dispute in the evidence and if the only question be one of law. See also United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243. In United States v. Illinois Central Railroad Co., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417, the court said that more discrimination does not render a rate illegal under Section 3 but that only such orders as involve unjust discrimination are obnoxious to the Section. From an analysis of those authorities, we conclude that we may set aside the Commission's order only if the record warrants the conclusion that the Commission acted outside the scope of the statute, or of its authority thereunder, or that its findings are not supported by the record, or that its conclusion of facts and law are so erroneous that its order based thereon is arbitrary or results in unjust or unreasonable discrimination.

What constitutes unjust or unreasonable discrimination is not always easy to discern. On this phase of the case, we are concerned only with a rate from Wichita and Enid to Memphis, a common point of destination. It would seem axiomatic that where you have two highly competitive, representative adjoining territories, engaged in the same enterprises, being the same distance from a common primary market, and whose transportation conditions to that market are the same, discrimination results if one is required to pay a substantially higher freight rate than the other. But under the authorities we may not interfere unless such discrimination amounts to undue discrimination within the meaning of the law.

In this proceeding the Commission seems to have departed from the basic concepts upon which it decided the Grain Case. While it adhered to its conclusions that weighted averages was a proper method for considering distances from a common market, it seems to have concluded contrary to its former decision that such factors did not require equali-

ty of rates between Enid and Wichita. It seems to have arrived at its conclusions increasing the differential in freight rates from Enid and Wichita to Memphis from 2 to 3½ cents from a consideration of entirely different factors. While it concluded that "Viewing the situation as a whole, no justification is found for the contention that the rates from the Wichita and Enid groups to Memphis are not properly subject to distance comparisons because of the different types of rate structure, * * * " it apparently reached its conclusions in this case from a consideration of an entirely different set of factors and comparisons.

As pointed out, the Commission found that Enid territory was representative of the Oklahoma adjustment and Wichita territory of the Kansas adjustment. It found that Enid produced approximately sixty-seven per cent of the state's wheat and that the City of Enid in this group was the principal grain and milling point in the state. It also found that Wichita, in the Wichita group, was one of the principal marketing centers in Kansas. We are concerned in this case with the common market for the two adjoining territories, Memphis. We are concerned here with the sole question whether the order prescribing a 3.5 cents higher rate from Wichita territory to Memphis than is fixed from Enid to the same market results in an unjust or unlawful discrimination between these two competing territories with respect to this common market. We lay aside the fact that Kansas, because of its more favorable location, has other outlets to Eastern markets, such as Kansas City, St. Louis and others. That in our view is not a factor to be considered in fixing equitable and just rates to Memphis and to the market reached through Memphis into the Southern territory. Kansas may not be penalized with regard to the Memphis market because of the advantages its enjoys with respect to these other markets and into other territory.[1] It is nonetheless

---

1. I. C. C. v. Diffenbaugh, 222 U.S. 42, 32 S.Ct. 22, 56 L.Ed. 83; Anchor Coal Co. v. United States, D.C., 25 F.2d 462; Indianapolis Freight Bureau v. C. C. C. &

entitled to a fair and equitable rate based upon relevant factors pertaining to transportation conditions to the Memphis market, such rates as will place it on an equal footing with the competing territory adjoining it on the South.[2]

While relative distances from a common market is not the only factor to be considered in determining fair rates between competitors for a share of a common market, they are of major importance where the distances are approximately the same and general conditions are likewise comparable, and they may well be controlling in determining the reasonableness or unreasonableness of rates between competitors in the absence of other persuasive factors.

As pointed out, in the Grain Case the Commission fixed the same rates for Enid and Wichita, 34 cents. Just what factors influenced the Commission in fixing such rates does not clearly appear nor need that be considered here. In the Southern case it found that weighted average distances furnish a much fairer basis of comparison than simple average distances, and in that case it said that "The complainant's basic comparison would seem to justify rate equality from the Wichita and Enid groups."

It adhered to this finding in this case but apparently did not follow the formula in fixing the rate for Enid and Wichita. It is not clear from the Commission's report what factors it relied upon in reaching its conclusions. It discussed weighted average distances and simple average distances. It found in substance that the weighted and simple average distances from Memphis are approximately equal. It made a study and comparison of scale rates of the various Oklahoma groups and of the Kansas groups with reference to Memphis. It averaged all the scale rates of all Oklahoma groups and all the Kansas groups and thus arrived at an answer which it called the average scale rate from each state to Memphis. This study was made by considering different factors, but in each instance it results in a lower state average for Oklahoma than for Kansas. It also compared Enid to other Kansas groups. Thus it points out that a comparison of the scale rate of the Great Bend group on the simple average distance is 64.5 cents as compared to Enid's 55 cents; and 64.5 cents as against 58.5 cents for Enid on the weighted average distance. But these two groups would seem not to be comparable. They are not similarly located with respect to Memphis. No doubt a comparison of Enid and Dodge City or Garden City, Kansas, would have shown still greater disparity. A proper perspective can be obtained only by comparing like with like. As was pointed out at the argument, if Eastern Colorado to the Pike's Peak region were still a part of Kansas as it once was, there would be a still greater difference in the average state rates, and by analogy might justify a further difference in rates between Enid and Wichita. Many other comparisons of various scale rates are set out. The Commission apparently concluded that it was essential in some way to reflect and maintain a proper difference in the average state rate of Oklahoma and of Kansas. It concluded that if the existing relationship of the other Oklahoma groups to Enid and of the other Kansas groups to Wichita were to be maintained, a further spread in the rate between Enid and Wichita was necessary to reach a proper state average for each state.

Under the authorities we may not, however, overturn the Commission's lower rate for Enid merely because we think it erred. In other words, we may not interfere because in making these measurements the Commission got wrong answers in the absence of unjust discrimination resulting therefrom. But

St. L. Ry. Co., 26 I.C.C. 53; Calif. Cold Storage and Dist. Co. v. A. T. & S. F. Ry. Co., 284 I.C.C. 326.

2. Indianapolis Freight Bureau v. C. C. C. & St. L. Ry. Co., 26 I.C.C. 53.

if in making its measurements, so to speak, it used an improper measuring stick, then its findings are without support and cannot stand, and we think that is what the Commission did. It averaged all the rates of the two states and concluded that a greater difference should be established between the average thereof than was reflected in the difference of 2.5 cents between the Enid and Wichita rate and, presumably to bring about an adjustment in the difference in the average rate, it concluded to further reduce the Enid rate so that it would be 3.5 cents lower than the Wichita rate. The apparent reason for making this further differentiation between the two comparable competitive groups was that it was necessary to make such a reduction in the Enid rate to bring about a proper differential in average of all Oklahoma rates compared with Kansas rates, without disturbing the existing relationship of the other Oklahoma and Kansas rates to the basic rates represented by Enid and Wichita. Comparing the average of all the Oklahoma group rates with an average of all the Kansas group rates could not tend to reflect whether the existing rates between these two highly competitive groups were fair and proper. That could be determined only by considering the factors applicable to the two groups themselves. We, therefore, conclude that in considering rates between the Enid group and the Wichita group, the Commission employed an improper standard, one which had no relation to the problem before it and could not bring about a proper result. In so doing the Commission acted outside the scope of its authority and the result is bound to be unjust and arbitrary.

It is true as stressed by intervenors that all preference is not undue preference. But to justify a preference in rates of one community over another the conditions and surrounding circumstances must be different. To illustrate, no undue preference results where a lower rate is given to a shipper who has service by both rail and water transportation over a shipper having service only by rail transportation. As has been repeatedly stated, no undue preference results where circumstances and surrounding conditions are dissimilar.[3] But when as here the Commission has found that these two groups are representative of the two states, are highly competitive, and that distance and transportation conditions to a common market are similar, other factors must be shown to warrant such a difference in rates. Certainly with respect to the general character of these two competing territories, no unusual conditions or surrounding circumstances appear which would warrant a difference of 3.5 cents in rates for the one over the other to the common market, Memphis. If such factors exist, we fail to see where the Commission has spelled them out. We are unable to glean from its opinion what extraordinary conditions it found to exist and relied upon to warrant such a difference in rates between these two basic communities.

We fail to see anything in the picture requiring that the relationship of the other Oklahoma groups to the Enid groups or the relationship of the other Kansas groups to the Wichita groups as presently constituted be maintained. It was the Commission's first duty to compare like with like and establish equitable rates on that basis. We think that it was its duty to consider these two highly competitive basic groups and establish rates that were fair and equitable between them, and, if after having done that it felt that it was required to realign other groups in relation to those two basic groups in order to reflect what the Commission considered was a proper differential in an average state rate, this realignment should then have been made. It could not lawfully be done by discriminating between these two like communities representative of the two

3. Cotton Exchange v. Atlantic C. L. R. Co., 190 I.C.C. 513; Southern Rates, 197 I.C.C. 393.

states and highly competitive with each other.

In support of the Commission's order, it is urged that it took into consideration a number of other factors, some of which are the historical relationship of the involved rates, the essential difference between the Kansas and Oklahoma rate structures, the need for restoring and preserving rate relationship throughout the entire grain territory and the preservation of long established relationships. That these are proper factors to be considered in establishing rates may be conceded. The Commission in its report devotes a great deal of space to a discussion of these various matters but it makes no specific finding regarding the factors or the influence they had with it in reaching its conclusion as to the rate for Enid and the rate for Wichita. As pointed out, it makes a great number of comparisons of the scale rates from the various Kansas groups and the various Oklahoma groups, and merely concludes that these comparisons indicate that the general level of the rates shown by these various tests "should be lower from Oklahoma as a whole than from Kansas as a whole." From these observations, it finds the lawful rates will be 55.5 cents from the Wichita group and 52 cents from the Enid group.

While the Commission is not required to make its findings of fact with the definiteness found in courts of law, it must set out its reasons for its conclusions with sufficient clarity so that the reviewing court may determine the factors upon which it relied in reaching its conclusions,[4] and that, we feel, it has failed to do. It is our conclusion that in measuring relevant average distances from all the Oklahoma groups and average distances from all the Kansas groups to Memphis in determining what, if any,

rate difference there should be between Wichita and Enid, it applied an erroneous yardstick, and that other factors upon which it may have relied in its findings are not sufficiently clear for a proper review thereof.

Not much need be said with respect to the rate from Memphis to the Carolinas in the Southern territory. The rate to Raleigh is taken as typical of the rates into the Carolinas. The Commission fixed a single rate from Memphis to Raleigh, North Carolina, from both Enid and Wichita, and, if the rates fixed from these two competing territories to Memphis are just and fair, there can be no fault with the rate from Memphis to Raleigh, because that rate is related to and dependent upon the rates from Wichita and Enid to Memphis.

We do not mean to be understood to say that the rates from Wichita and Enid to Memphis are in fact unjust and discriminatory. We do, however, hold that such rates cannot stand because on the record the one yardstick used by the Commission in reaching its conclusions, in which it has spelled out its findings, is an improper yardstick to use in fixing equitable rates between the two highly competitive groups in the two states and that with respect to any other factors which may have entered into the Commission's conclusions, its findings are too vague and indefinite to enable us to appraise them on review.

For the reasons outlined above, it is our conclusion that the challenged rate cannot stand; that it must be set aside and the matter remanded to the Commission for its further consideration. The prevailing party will prepare and submit a proposed decree effecting the views set out above and will submit the same to opposing counsel for their inspection.

4. Secretary of Agriculture of United States v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015.